Middleton *et al. vs.* The State.

JACK MIDDLETON *et al.*, plaintiffs in error, *vs.* THE STATE OF GEORGIA, defendant in error.

In cases of felony it is not competent for a jury to convict upon the testimony of an accomplice, unless that testimony be corroborated by circumstances tending to connect the defendants with the crime. The case of *Childers vs. The State,* 52 *Georgia,* 106, controls this case.

Criminal law. Witness. Accomplice. Before Judge SCHLEY. Chatham Superior Court. November Special Term, 1873.

Jack Middleton and William Seabrook were placed on trial for the murder of John Houston. The evidence disclosed the following facts: The body of deceased was found in the Savannah river with the appearance of having been in the water several days. There was a wound upon the head which was sufficient to produce death. It looked as if made by a crow-bar, or some other such instrument. The deceased was employed as a watchman on a lighter which lay off Fort Jackson. This boat contained wrecking material. Some of this was subsequently found in Dennis O'Connell's junk shop, in the city of Savannah. It was purchased by O'Connell from Scott Thurman and Zeke Jackson. The former gave his name as Scott Williams.

Here the state introduced Scott W., *alias* Thomas W. Thurman, who had been indicted with the defendants for the same offense, a *nolle prosequi* having first been entered as to him. The witness testified as follows: On the 26th September, 1872, Jack Middleton proposed that I ride with him in his boat; I consented. He, William Seabrook, Zeke Jackson and myself, met at Mrs. McGuire's, on Farm street; Middleton proposed that we all go on a riding expedition; we went, and found, abreast Fort Jackson, two large lighters or barges. We heard some one talking to Houston; we made fast to the pillars of the Fort; after a while I proposed a return; I went to sleep, and was awoke about half-past eleven at night by a steamer; I wanted to come back, but Middleton took me over

to the lighter; after getting up, Houston said he did not like so
many men on board that time of night; Middleton asked him
about selling the iron; Houston refused to sell—went into his
cabin and got an old sword and pistol; Middleton said, while
Houston was gone, " shove him overboard and let him swim to
shore;" I said we had better tie him, if we do anything; it won't
do to harm him. Middleton said, " you are fixing for him to
halloo, now;" Seabrook said, " that ain't worth a d—n." Jack-
son knocked Houston down as he was passing with a crow bar;
witness tried to keep Jackson from throwing Houston over-
board; Seabrook seemed also to be trying to stop it. Houston
rose after being thrown in by Jackson, and swam to the boat;
Jackson and Middleton loosened his hold and drowned him.
Then Middleton and Jackson took the iron and passed it to
Seabrook, who stored it away. Middleton cursed and abused
me because I would not help; from fear I kept silent; we
came up and landed at the canal dock; Middleton ordered all
hands to meet there at five o'clock that morning; at eight I
went down to the bluff, and saw them unloading a wagon;
was present when the iron was sold; Mr. O'Connell paid
Zeke Jackson $18 10; Jackson then divided the money with
the party; he kept $6 00, Middleton took $5 00, Seabrook
$3.50, and I was given $3 60. Seabrook fastened the boat;
Middleton said he wanted no cowards; that if he could not
buy the iron he'd have it anyhow. Went up the country to
Effingham, to work; after the arrest of Jackson and Middle-
ton, I went to South Carolina; proposed to Seabrook to come
to Savannah; he swore he would not. Mr. Morgan and Mr.
Strobhar arrested me; told Mr. Morgan all about it when ar-
rested, without any inducement offered. Seabrook broke and
ran, but stopped and came back; he was with me at the time
of the arrest. No bargain was between us, so far as I know,
when we went down the river; did not know Houston; did
not know what the party was about until they had remained
at the Fort; went to sleep, and woke up at half-past eleven
at night; we left the city about five p. m.; don't know what
they were talking about from the time they left the city; did

not go to sleep until after we got to the Fort; when I wanted to go back Jackson told me I was a child; it was after this that I went to sleep; I did not row back; up to the time that Jackson struck, nothing was said about killing, except what Middleton said about throwing him overboard. When Seabrook had hold of Houston I asked him if he was pulling him away; he said, no, by-G—d, he was choking him to keep him from hallooing; I made no effort to save Houston; saw it was no use; we got back to the city about half-past two in the morning; made a confession to the magistrate; nothing was offered me to confess.

BENJAMIN D. MORGAN said: He had heard all that witness, Thurman, had said on the stand; it agreed with what he told him in South Carolina, almost word for word; Thurman's confession was voluntary; I told him if he would make the statements made to me before a jury he would be severely punished, but that his neck would be saved.

William Seabrook, in his statement, denied any connection with the murder; said it was Scott Thurman who tried to get him to come to Savannah from South Carolina, and swear against Middleton and Jackson.

Jack Middleton said he knew nothing about the matter, except what Thurman told him.

Thurman, (recalled,) said: Never had an opportunity of talking to Middleton; didn't say a reward was offered him with which to employ counsel.

The jury found the defendants guilty. A motion was made for a new trial because the verdict was not authorized by the testimony. The motion was overruled and defendants excepted.

J. V. RYALS; G. W. OWENS; S. B. ADAMS, for plaintiffs in error.

ALBERT R. LAMAR, solicitor general, by R. H. CLARK, for the state.

McCay, Judge.

There is in this record absolutely *no* evidence corroborating the accomplice, Thurman, in the sense of the law. We decided, in the case of *Childers vs. The State,* 52 *Georgia,* 106, that the corroborating circumstances must be such as connect the prisoners in some way with the crime. We have, in that case, fully given our reasons for thus holding, and we will not repeat them. The conviction in the case at bar is based solely on the testimony of Thurman. There are circumstances going to show *he* is guilty, other than what he states, but absolutely none that the prisoners are. It is plain that he and Jackson sold the iron at the junk shop, and, identified as that iron was next day by the owner of it, he knew, before any confession was made, that there was evidence against him. It was a small virtue for him to tell the tale he does *after that.* What circumstances there are in the record, other than those detailed by the accomplice, rather go in favor of the prisoners. The junk man, as well as his employee, Monroe, both testify that neither of the prisoners were present when the iron was sold, and that Thurman and Jackson brought it to the shop. It is not at all a reasonable story that the head men in the murder and robbery should trust the plunder to the witness and to Jackson. The fair inference from his statement, too, is that he meant to testify that all were present at the selling.

We only mention these circumstances to show that, in common reason, it ought to take pretty strong circumstances to corroborate such an accomplice; whereas, in the sense of the law, there are no circumstances of corroboration—nothing that in any way connects the prisoners with this crime but the statements of the witness. That he told the same tale when arrested is not only no corroboration by any matter connecting the prisoners with the crime, but it is illegal testimony any way. It is strange to bolster up a witness by proof that he has told the same story before. We know of no authority for such a practice.

Judgment reversed.